**In re EMPIRE INTERIORS, INC. and Empire Furniture of Mentor, Ltd., Debtors.**

**Richard A Baumgart, Trustee, Plaintiff,**

**v.**

**Bedlyn, Inc., et al., Defendants.**

**Bankruptcy Nos. 99–16863, 99–16864. Adversary No. 00–1052.**

United States Bankruptcy Court, N.D. Ohio, Eastern Division.

April 27, 2000.

Robert D. Barr, Cleveland, Ohio, for plaintiff.

Steven S. Davis, Cleveland, Ohio, for defendant, Bedlyn, Inc.

Steven A. Freedman, South Euclid, Ohio, for defendant, Joan Lichko.

Michael Poklar, Pepper Pike, Ohio, for defendant, Donald Lee.

### MEMORANDUM OF OPINION AND ORDER

RANDOLPH BAXTER, Bankruptcy Judge.

Richard A. Baumgart (the Trustee) filed his Complaint to set aside a fraudulent transfer and to determine validity, priority and amount of liens and claims in the above-styled proceeding. Upon the conclusion of a trial proceeding, an examination of the evidence adduced and of the record, generally, the following factual findings and conclusions of law are rendered:

On September 3, 1999, Empire Interiors, Inc. and Empire Furniture of Mentor, Ltd. (jointly referred to as "The Debtor") filed their respective voluntary petitions for relief under Chapter 7 of the Bankruptcy Code. Subsequently, both cases were consolidated for administrative purposes. Prior to August of 1999, the Debtor owned a leasehold interest in certain real property located at 5367 Northfield Road in Bedford Heights, Ohio (the Bedford Lease). The landlord for the Bedford Lease is Defendant Joan E. Lichko (Lichko). The tenant is Empire Interiors, Inc. The underlying real estate consists of a free-standing, single-story building of approximately 20,000 square feet of floor space, situated on .79 acres of land.

The Lease period commenced on May 1, 1998 at an initial term of five years, plus two additional option terms of five years each. Presently, three years remain under the Lease, at a minimum monthly rental rate of $8,000.00. The Debtor used the leased premises as a retail furniture store.

In August of 1999, approximately one month before bankruptcy filing, Bedlyn, Inc. (Bedlyn) and the Debtor entered into negotiations for the purchase of certain of the Debtor's assets. A purchase agreement was apparently drafted but was never executed (Ex. 5). The proposed purchase agreement called for the Debtor to assign its interest in the Bedford Lease and another leasehold interest located in Brooklyn, Ohio to Bedlyn.

On or about August 30, 1999, a document was executed by the Debtor and Bedlyn, through their respective principals, captioned "Assignment and Assump-

tion of Lease" which, purportedly, assigned the Debtor's interest in the Bedford Lease to Bedlyn (See, Ex. 2). This assignment occurred some four days prior to the Debtor filing for bankruptcy relief. From these factual findings, the Court must determine whether the assignment between Bedlyn and the Debtor constituted an avoidable fraudulent transfer.

Under § 548 of the Code, the following is noted:

§ 548  Fraudulent transfers and obligations

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

As noted above, § 548(a)2(A) and (B) empowers a trustee to avoid certain transfers as fraudulent without requiring proof that the transfers were made with actual intent to defraud creditors. Such a transfer is referred to as being "constructively fraudulent."[1] Notedly, neither § 548(a)(2) or (b) requires any actual intent to hinder, delay or defraud creditors. Rather, the focus is on the debtor's financial condition at the time of transfer or as a result of the transfer. While subsection (b) requires actual legal insolvency, subsection (a)(2), alternatively, requires actual legal insolvency, subjective equitable insolvency, or under capitalization. Practically, when a transfer is avoided on the basis of subsection (a)(2), the financial condition requirement is typically satisfied by proof of actual insolvency, as opposed to subjective insolvency or under capitalization.

Where a trustee seeks to avoid a transfer under § 548(a)(2) due to constructive fraud, the trustee bears the burden of proof on all of the required elements, including the debtor's insolvency and inequivalency of value. The standard of proof in the constructive fraud case is preponderance of the evidence.

For § 548(a)(2) purposes, the definition of "insolvency" is identical to the meaning of that term found in § 547 preferences. That is, a person is insolvent when the sum of such entity's debts is greater than all of such entity's property, at a fair valuation. This statutory definition found in § 548(a)(2) and creates a balance sheet test for determining solvency.

Beyond the solvency issue, the Court must determine whether what the Debtor received in exchange for the transfer was of reasonably equivalent value. *In re Fordu*, 201 F.3d 693, 699 (6th Cir.1999), citing, *Matter of Vitreous Steel Prod. Co.*, 911 F.2d 1223, 1234–35 (7th Cir.1990) (The test used to determine reasonably equivalent value in the context of a fraudulent conveyance requires the court to determine the value of what was transferred

1.  Epstein, D. G., et al., *Bankruptcy*, § 6–49, p.  371 (1993).

and compare it to what was received.) This occurs in a two-step process. First, the Court must ascertain whether the Debtor received any value for the transfer. If so, then a comparison must be made of the worth of the value received by the debtor to the property which was transferred in exchange. It is well understood that neither an executory promise nor anything else is value unless it provides an economic benefit to the debtor. See, *In re Cottrill*, 118 B.R. 535, 537 (Bankr.S.D.Ohio 1990); *In re Ohio Corrugating Co.*, 91 B.R. 430, 436 (Bankr.N.D.Ohio 1988) (The standard for reasonably equivalent value requires the debtor to have received either a direct or indirect economic benefit.). The rationale for this implicit economic benefit requirement is to protect a debtor's unsecured creditors by preserving the value of the debtor's estate to which they must look for satisfaction of their claims.

■ In this § 548(a)(2) proceeding, the parties have stipulated that the Debtor was insolvent at the time of the subject transfer. Thusly, the remaining issue for determination is whether the Debtor received less than a reasonably equivalent value in exchange for the transfer. See, 11 U.S.C. § 548(a)(2)(A). An examination of the evidence adduced reveals that no reasonably equivalent value was given by Bedlyn in exchange for the transfer.

Valuation testimony relating to the Lease was provided by both parties. Gary Gruehl, on behalf of the Trustee, is a commercial real estate broker who marketed the Bedford leasehold in January, 2000 in the amount of $80,000.00 for the balance of the current lease. A triple net lease, Gruehl offered a broker's opinion value of $1.3 Million for the Bedford Lease at $7.00 to $7.50 per square foot rental.

Stephen Crowther provided valuation testimony on behalf of Bedlyn regarding the Bedford Lease. His broker price appraisal of the Lease was stated as a range between $4.50 p.s.f. to $5.00 p.s.f. He testified that the best indication for market value is what a landlord with a willing tenant is willing to pay for a leasehold interest. Equivocally, he conceded that his best indicator for market value of Bedford exceeds his broker price value opinion once he was told that a third party, Donald Lee, had offered $100,000.00 for the Bedford Lease. Significantly, he testified that he had no basis for believing that Lee's offer was not a sincere offer or was not an arm's length transaction.

An examination of either valuation experts' testimony reveals that the Bedford Lease's value, although disputed, is far in excess of that which was paid by the transferee Bedlyn on August 30, 1999.

The testimony of Armand Guerrini, Bedlyn's principal, clearly revealed that Bedlyn paid nothing for the purported assignment of the Bedford Lease, other than mere unsupported expenses related to the transaction. Those expenses were reportedly paid to an entity known as Ashely Industries, but Guerrini admitted he had no proof of such payments (Cross–Exam.). The subject Assignment and Assumption of Lease (the Assignment) (Ex. 2) for the Bedford leasehold shows an execution date of August 30, 1999, some four days before the Debtor filed its bankruptcy petition. The stated consideration for the transaction was "Ten Dollars ($10.00) and other good and valuable consideration...." (Ex. 2–1). Guerrini also admitted he paid the $10.00 in cash but had no proof of having paid it. (*Id.*). He explained that the "other good and valuable consideration" related to some non-descript help he gave to the Debtor in order for the Debtor to receive merchandise that it otherwise could not receive.

Notwithstanding the contested execution of the Assignment, Bedlyn possesses no indicia of ownership of the Bedford household. As attested by Guerrini, Bedlyn possesses no keys or alarm codes for the Lease. Nor has it changed the Lease's utilities obligations to the name of Bedlyn; has not changed any telephone numbers; has not paid any rent or actually possessed

the premises. He explained that no rent was paid due to the owner's rejection of payments tendered. Lastly, Bedlyn has paid no taxes or insurance premiums.

On August 19, 1999, Guerrini and the Debtor's principal, Ray Salupo, executed a letter agreement (Ex. 4) for the acquisition by Bedlyn of both the Bedford and Brooklyn Leases. The stated purchase price was $300,000.00 for all of the leasehold assets. Guerrini testified that the $300,000.00 was never paid. (*Id.*). In summary: (1) only an unsupported nominal cash payment of $10.00 was given for the transfer to Bedlyn; (2) other valuable consideration was ill-defined and was unsupported at best; (3) equivocally, Guerrini testified that he paid expenses but nothing else for the Lease Assignment; (4) the purchase price of $300,000.00 called for in Exhibit 5-2 was never paid; and (5) the purchase agreement (Ex. 5) was never consummated. The totality of these findings sufficiently evince that no reasonably equivalent value was paid by Bedlyn for the subject transfer. The Trustee has met his burden of proof by a preponderance of the evidence standard.

Accordingly, judgment is hereby rendered in favor of the Trustee, and the subject transfer is set aside as a fraudulent transfer pursuant to § 548(a)(2) of the Code. Each party is to bear its respective costs.

**IT IS SO ORDERED.**